IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

DUDLEY T.,
    Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,
    Defendant.

Case No. 4:17-cv-04264-JEH

## Order and Opinion

Now before the Court is the Plaintiff Dudley T.'s Motion for Summary Judgment (Doc. 10) and the Commissioner's Motion for Summary Affirmance (Doc. 13).[1] For the reasons stated herein, the Court GRANTS the Plaintiff's Motion for Summary Judgment, DENIES the Defendant's Motion for Summary Affirmance, and REMANDS this matter for proceedings consistent with this opinion.[2]

**I**

At the age of 63, Dudley T. filed a claim for disability insurance benefits (DIB), alleged a disability onset date of December 31, 2004, and his date last insured was December 31, 2009. After a hearing with an Administrative Law Judge, Dudley's claim was denied on October 27, 2010. The Appeals Council (AC) denied review of that claim and Dudley filed a Complaint in this Court on April 18, 2012. This Court remanded Dudley's claim on July 31, 2013 due to an improper

---

[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 8, 9).
[2] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears as (Doc. 5) on the docket.

1

hypothetical question, the use of an improper legal standard, and the failure to properly consider the disability determination of the Veterans Administration (VA). The AC then returned the case to the ALJ pursuant to the Court's order. On April 28, 2014, a second hearing was held before a different ALJ, Robert H. Schwartz. ALJ Schwartz denied Dudley's claim, and Dudley submitted exceptions to the final decision to the AC. The AC remanded the case back to the ALJ again.

A third hearing was held on October 5, 2015 at which time Dudley was represented by an attorney, Medical Expert Nathan R. Strahl, M.D. (ME) testified, and a Vocational Expert (VE) testified. On November 4, 2015, ALJ Schwartz again denied Dudley's claim for DIB. Dudley again filed written exceptions, but the AC refused to assume jurisdiction making the November 4, 2015 Decision final. The AC ultimately granted Dudley additional time to file the instant case which he did on September 26, 2017.

II

At the October 5, 2015 hearing, Dudley was a 70-year-old Vietnam veteran. He originally alleged that the conditions which caused him to be disabled included post-traumatic stress disorder (PTSD); ulcerative colitis; irritable bowel syndrome (IBS); and depression. He had previously testified at length about his alleged conditions at the hearings in June 2010 and April 2014.

At the June 2010 hearing, Dudley testified about the impact of his ulcerative colitis on his work toward the end of his time at his last job. He testified about the current impact upon his life due to ulcerative colitis including that he had to use the bathroom six times a day, but if he were stressed he could go up to 10 times a day in a 24-hour period. AR 31. He testified that he did not deal with stress well and that he did not want to leave the house and did not want to drive at night. "I think that I want to know all about everything everywhere all the time and everything has to be where it's supposed to be." AR 32. He explained he got up

2

three to four times every night, he patrolled his house during the night, he looked around in his driveway and in the street, he checked to ensure all the doors and windows were locked, and he checked to make sure the water was shut off. *Id*. He occasionally saw family, participated in VA group therapy, and attended Bible study. Dudley testified that he did not like crowds or loud noises. He testified that changes at work before he left that job made him feel that he could not keep up. Upon his boss calling him in, Dudley's stomach would burn, and he would get diarrhea "immediately." AR 51. He retired because he did not want to get fired and jeopardize any benefits he may have otherwise received.

At the April 2014 hearing, Dudley again testified about the issues he had at his last job, the patrol of his house during the night, and the issues he had with ulcerative colitis. He said "the depression, attention, and the stress of me underperforming was – was still there when I went back to work [after he finally started treatment for his ulcerative colitis in 1990s]." AR 694. "At 60, I – I could – I could not do it anymore." *Id*. He discussed when he was first diagnosed with PTSD, and that "they called it a heightened sense of . . . awareness." AR 697. He thereafter started to see a therapist at the VA. He testified that his wife and he spent winter in Texas in 2009.

Finally, at the October 2015 hearing, Dudley testified once again about his ulcerative colitis symptoms, his exaggerated startle response, and his continued sense of being on guard during the night. At all three hearings a VE was questioned. At the last hearing, ME Strahl, board certified in psychiatry, testified after reviewing Exhibits 1A through 9A (previous determinations made on Dudley's claim for DIB) and Exhibits 1F to 33F (medical evidence) in Dudley's file. He stated his medical opinion that Dudley's PTSD was a major diagnosis with "a secondary element relative to PTSD of depressive disorder." AR 654. Dr. Strahl gave Dudley a mild deficit rating in activities of daily living, a mild deficit rating

3

in terms of socialization, and believed record evidence did not support "any real deficit in [Dudley's] ability to concentrate, focus, or persistence [sic] in pace." AR 657. Dr. Strahl clarified that in rendering his opinion, he did not look at Dudley's age, past record of work, or past record of service to the country.

III

In his November 4, 2015 Decision, ALJ Schwartz (ALJ) determined Dudley had the following severe impairments: ulcerative colitis; depression, and PTSD. AR 628. The ALJ found none of those impairments met or medically equaled the severity of a listed impairment. He noted medical records in which Dudley indicated he found Pepcid very helpful in the management of his ulcerative colitis flares. The ALJ also pointed out a handful of flares Dudley experienced between August 2006 and January 2008 and that they resolved on their own. The ALJ noted instances when Dudley reported no bleeding, was doing well in general, and was doing fairly well in general. AR 629. To support only a mild restriction in Dudley's activities of daily living, the ALJ pointed out that Dudley testified to reading the newspaper, reading books, paying bills, talking with his wife regularly, spent winters in Texas, socializing with friends and family while in Texas, "got a lot of exercise" by bicycling in Texas, walking his dog, attending church, and singing in the choir with his wife. *Id*. at 629-30. The ALJ similarly relied upon many of those activities to find Dudley had no more than moderate difficulties in social functioning. The ALJ determined Dudley had no more than moderate difficulty with regard to concentration, persistence, or pace. The ALJ noted Dudley testified to difficulty concentrating and hypervigilance (particularly at night). AR 630. He considered both Dr. Strahl's opinion and the State Agency sources' opinions.

The ALJ made the following residual functional capacity (RFC) finding:

4

> [T]he claimant had the [RFC] to perform medium work as defined in 20 CFR 404.1567(c) with the following non-exertional limitations. Any work must have allowed for washroom accessibility. Although he was capable of understanding and remembering complex and/or detailed instructions, deficits in concentration, persistence, and pace due to his combination of impairments limited him to performing simple, routine, and repetitive tasks on a sustained basis with only routine breaks. He must have avoided more than occasional contact with the general public and any tasks must not have required closed, sustained interaction with others. Any work must not have required more than ordinary or routine changes in work setting or duties.

AR 631. He initially noted that he incorporated by reference the discussion in the two prior decisions regarding Dudley's allegations and testimony. From the most recent hearing in 2015, the ALJ mentioned Dudley's testimony that he quit working full-time in December 2004 due to blood in his stool and the resulting inability to concentrate on work, the urgency to use the bathroom Dudley "always" had, his constant worry about colitis, his exaggerated startle response, and his ability to go to church and sing in the choir. The ALJ also noted Dudley's comment that on a bad day, he would just not attend choir. The ALJ also summarized Dr. Strahl's hearing testimony.

The ALJ concluded, "[Dudley's] claims of extremely limited functional capacity are not demonstrated by the medical records or reports of activities. The claimant alleged that problems with colitis and anxiety interfered with his work before he eventually retired after working for 38 years." AR 633. The ALJ observed that treatment notes suggested Dudley's condition generally responded well to treatment without debilitating side effects. He noted Dudley's treating gastroenterologist, Michael Cassaday, D.O. "specifically stated that the claimant generally did fairly well on medication and his colitis flares were intermittent and sporadic[.]" *Id.*

The ALJ next addressed the evidence pertaining to Dudley's PTSD. He concluded, "[T]he record does not support a finding that [Dudley's] depressive disorder or anxiety disorder would have prevented him from performing relatively 'low stress' work consistent with the specific limitations set forth in the adopted [RFC]." *Id*. The ALJ relied upon Dudley's treatment history, clinical findings, and daily activities before and after his date last insured to support that assessment. Dr. Strahl's opinions were given "varying amounts of weight." AR 634. The ALJ specifically highlighted Dr. Strahl's testimony that Dudley had chronic mild depression that was worse when his colitis was worse, but was still no more than a moderate level of depression. The ALJ gave a State Agency medical consultant's opinion "great weight" that Dudley could perform unskilled work. *Id*.

The ALJ detailed Dr. Cassaday's July 2014 letter in which he noted Dudley did "fairly well" on routine medications and his intermittent flares of colitis only required additional medications. AR 1400. He noted Dudley's symptoms of cramps, discomfort, and bowel movement urgency occurred "sporadically" and "sometimes" required additional medications or diapers. AR 635, *citing* AR 1400. The ALJ concluded Dr. Cassaday was "very vague with respect to the length of the flares" and "did not specify how they incapacitated [Dudley]." AR 635. He accordingly gave Dr. Cassaday's opinion "little weight." Id. The ALJ also noted that Dr. Cassady wrote in December 2007 that it was his opinion "that certainly [PTSD] can contribute to the complexity of the management of the claimant's ulcerative colitis as well as issues regarding control of his symptoms and flare of the disease process." *Id*. The ALJ emphasized that Dr. Cassady wrote PTSD "can" affect colitis, "but not that it actually did in the claimant's case." AR 635. The ALJ found it significant that Dr. Cassady made no mention of PTSD, any mental health condition, or any mental health symptoms when he provided a short summary of

6

Dudley's colitis symptoms and treatment in July 2014. The ALJ thus decided, "This suggests that the claimant's colitis and PTSD were not as intertwined as the claimant has alleged." *Id.*

Finally the ALJ mentioned he considered the VA's finding that Dudley was disabled under its guidelines, Dudley's therapist's letters written on his behalf, and Dudley's GAF scores.

## IV

Dudley argues the ALJ's assessment of his subjective complaints was patently wrong because: the ALJ erroneously discredited Dudley's allegations of disabling colitis symptoms; the ALJ erroneously discredited Dudley's allegations of disabling PTSD symptoms; the ALJ mischaracterized Dudley's daily activities and relied upon the opinion of an ME who mischaracterized Dudley's activities; and the ALJ failed to consider other factors that add to Dudley's credibility and failed to address other factors in the decision despite these being raised specifically at the hearing. Dudley also argues the ALJ erred when assessing his RFC.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind

7

might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. *See* 20 C.F.R. § 404.1566. The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. § 404.1520. In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;

2) suffers from an impairment that is severe or whether a combination of her impairments is severe;

3) suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4) is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and

8

> 5) is unable to perform any other work existing in significant numbers in the national economy.

*Id.* An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

In the instant case, Dudley claims error on the ALJ's part at Step Four.

## A

In support of his argument that the ALJ erred in discrediting his allegations of disabling colitis symptoms, Dudley makes clear he does not claim he could not work while he was working; he claims that despite years of attempting to work with his symptoms, he finally reached a point where he was unable to function in a work setting. He contends the ALJ erred by mischaracterizing the evidence after the alleged onset date, assumed if Dudley's colitis symptoms were stable they were minimal, failed to properly consider the waxing and waning nature of his colitis, and failed to consider how anxiety exacerbated his symptoms such that his combined impairments led him to reduce his activities. The Commissioner counters that the ALJ did not minimize Dudley's symptoms but rather established that the medical record provided his symptoms did not always wax and wane, the ALJ considered his symptoms did wax and wane (when he noted Dr. Cassady said Dudley's colitis flares were "intermittent" and "sporadic"), and recognized and

9

eliminated Dudley's worry about the location of the closest bathroom where the ALJ found that any job Dudley could perform must include washroom access. The Commissioner also argues that a claimant's daily activities are a regulatory factor for an ALJ to consider, and the ALJ's analysis otherwise followed the subjective symptom evaluation provided in 20 C.F.R. § 404.1529(c)(3)(i)-(vi).

In her Memorandum, the Commissioner points out, verbatim, what the ALJ listed as Dudley's daily activities. She argues, consequently, the ALJ fulfilled his obligation to consider Dudley's daily activities. However, her argument is unresponsive to Dudley's contention that the ALJ mischaracterized the evidence of record and it overlooks relevant case law. SSR 96–7p[3] instructs that when "determining the credibility of the individual's statements, the adjudicator must consider the entire case record," and that a credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." SR 96-7p at *2. An ALJ should consider elements such as objective medical evidence of the claimant's impairments, the daily activities, allegations of pain and other aggravating factors, "functional limitations," and treatment (including medication). *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004); *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). A credibility finding "must be supported by the evidence and must be specific enough to enable the claimant and a reviewing body to understand the reasoning." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008).

As the relevant case law makes clear, it is not enough for an ALJ to simply consider a claimant's activities of daily living. The ALJ must *properly* consider those activities. *See Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) ("although it

---

[3] While the Social Security Administration published SSR 16-3p (effective March 28, 2016) which rescinded and superseded SSR 96-7p, SSR 96-7p was still in effect at the time of the ALJ's November 2015 Decision.

is appropriate for an ALJ to consider a claimant's daily activities when evaluating their credibility, SSR 96–7p, at *3, this must be done with care"). The Seventh Circuit Court of Appeals has "repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Id.* (citing cases).

Here, the ALJ ignored several statements Dudley made at his three hearings which shed light on his limitations in daily activities. At the first hearing, Dudley testified he could cough or sneeze and he would fill his pants. AR 30. He wore diapers. *Id.* His ulcerative colitis caused him cramps "at any time and half a dozen bathroom visits every day, loss of sleep from getting up in the middle of the night to go to the bathroom and not wanting to leave the house until I can find another toilet and another toilet." AR 30. He wore diapers "[e]very time [he] had to go anywhere, whether it's to church or –" for ten years off and on. AR 30-31.

At the second hearing, Dudley testified that he had diarrhea every day and that it was uncontrollable. AR 701. He stated he previously bought a mountain bike to become more active, but it sat on a hook in his garage and he had not touched it for five years. "[T]here's no enjoyment with – with that." AR 700. He "sometimes" had cramps. AR 701. He testified his colitis symptoms would come on so fast that he would have to pull his car over if he were driving. He said, "I lead a guarded life about where I'm going go [sic] with . . . how tolerate [sic] today. The last thing that I've eaten is two pieces of toast on Saturday morning [two days before the hearing]." AR 703. He did not eat in public because he was worried he would have an exacerbation after a meal. He testified that a combination of his PTSD and colitis caused him unpredictable bowel movements, exhaustion, and agitation. AR 704. As for his trips to Texas for the winters, the car trip took three days. During that trip, Dudley limited himself to one meal per day, toward the

11

middle part of the day. "And then there's always Imodium to try and control diarrhea. And the – there's two chair pads that – that I put over the car – the car seat. And I've pulled over off of the side of the road, and look – look for some bushes and – a few times." AR 705. He continued that he and his wife would have to stop for two hours at a time on the trip. His cramps prevented him from doing anything as he experienced them and, at times, Dudley would switch driving with his wife so that he could put his passenger seat back to recline a bit. AR 707. Dudley explained that helped his symptoms. At his third and last hearing, Dudley testified:

> [E]ven today, I was looking for – looking for a bathroom. There's – there's always that urgency. And you – you – it – you can't relax. You can't calm down. You – you can't stand down, because you don't know when you're going to get cramps, and [he would] make – with another run to the bathroom.

AR 668. Even when he was not having colitis flares he worried about them. He explained that if he were having a bad day due to a colitis flare or he was too stressed out, Dudley would just not go to choir if he did not want to do so. AR 670.

Nowhere in the ALJ's Decision does he discuss the extent to which Dudley testified his symptoms caused limitations in daily living in general or in his specifically identified daily activities in particular. There was a passing reference in the ALJ's Decision to Dudley's testimony that he would not attend choir if he had a bad day. That is not enough to satisfy the ALJ's obligation to properly consider Dudley's daily activities. As Dudley argues, the ALJ mischaracterized evidence of Dudley's activities of daily living in the Decision. The "critical differences between activities of daily living and activities in a full-time job" are made even more critical when an ALJ fails to accurately present a claimant's limitations in completing his daily activities. *See Bjornson v. Astrue*, 671 F.3d 640,

647 (7th Cir. 2012) (stating that the critical differences between the two are that "a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as she would be by an employer"). The ALJ clearly failed to recognize these differences and such failure amounted to a "deplorable" feature of his Decision. *See id*. This is especially true in this case where there was evidence of how Dudley performed in his job while he experienced the limiting symptoms caused by ulcerative colitis shortly before he retired in 2004. Dudley insists that he finally reached a point where he was unable to function in a work setting despite years of attempting to work with his symptoms.

Dudley testified at his first hearing in 2010 that he left his last job because he could not do it anymore as he spent a lot of time in the bathroom. AR 28. "[He] would have cramps and [he] would have bloody diarrhea and explosive diarrhea and black diarrhea and it took away from my ability to do my job and I couldn't concentrate." *Id*. He testified further that he was called into his boss's office and the latter would tell him his speed and accuracy were not what they should be and he could be replaced. Dudley explained that his cramps caused him to go to the bathroom, sometimes for 20 minutes, and he would lay on the floor and then return to work to "see if I could pick up where I left off[.]" AR 29. He wore diapers the last few years that he worked. AR 50. At his second hearing in 2014, Dudley testified that he decided to stop working in 2004 for several reasons including sleep loss during the night, supervisors reminded him to do a better job, he had headaches and became frustrated, and he was exhausted and then his stomach began to give him problems (diarrhea). AR 688-89. He said his health problems continued to his then-current state where "there's blood in my stool, and if you see blood in your stool, you're not going to get much done." AR 689. He went on:

> There was a time where there was six years that I did not get a raise. And the – the – the bloody diarrhea had – had stomach cramps, and I was on the floor in – in my cubicle for 10 minutes, 15 minutes, 20 minutes waiting for the gas cramps to try and pass. And then if – at that time, I had diarrhea, then I'd have to go to the bathroom, then I'd have to clean it up, so I had a bag that I would take with me. I'd had diapers and it'd have change of pants and it'd have towels. And tums and Rolaids and Pepto-Bismol and Imodium and that was how – how I lived my life, and it did not get any better.

AR 690. He also stated that he soiled his office chair at work which caused him to get a chair pad. AR 699. He explained that his bathroom issues and accidents caused him to be away from his work terminal for a half hour at a time. AR 700-01. At the last hearing in 2015, Dudley testified again about the distraction at work caused by his bloody stool. He explained he would not get much work done as he was distracted by his bloody stool. The work he did complete he would have to review it the next day because "it wouldn't – not be my best work." AR 668.

Once again, nowhere in the ALJ's Decision did he discuss Dudley's testimony regarding the extent to which he found himself affected by colitis symptoms at work before he left in 2004. *See* 20 C.F.R. 404.1520(a)(3) ("We will consider *all* evidence in your case record when we make a determination or decision whether you are disabled") (emphasis added). The ALJ went only so far as to summarize that Dudley testified he quit full-time work in 2004 "due to blood in his stool and the resulting inability to concentrate on work." AR 632. Later, the ALJ determined that while Dudley alleged his "problems with colitis and anxiety interfered with his work before he eventually retired after working for 38 years . . . he managed to work a relatively stressful job steadily despite that condition and despite the stress he has alleged." AR 633.

Determinations of credibility made by the ALJ will not be overturned unless the findings are patently wrong. *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir.

14

2012). "Patently wrong" means an ALJ's decision lacks any explanation or support. *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014). The ALJ in this case made a patently wrong credibility determination because it lacks support in the record given the erroneous way in which the ALJ represented relevant evidence. It is true the ALJ also pointed to Dudley's objective medical evidence, a listed factor to consider, to support his conclusions about the latter's limitations. However, the ALJ relied heavily upon Dudley's daily activities to reduce the significance of medical findings which showed ongoing issues with Dudley's ulcerative colitis. Thus, the ALJ's SSR 96-7p analysis was fatally flawed. This matter must be remanded.

**B**

The Commissioner argues that Dudley's RFC finding argument is simply an extension of his subjective symptom evaluation claim. The Court agrees and therefore finds there is no need to separately address the ALJ's RFC finding where the Court has already determined the ALJ made a fatal error in his consideration of Dudley's subjective symptoms. The RFC finding must accordingly be revisited upon remand.

This case presents a close question as to whether Dudley is entitled to a remand with instructions for the Commissioner to calculate and award benefits to him. "An award of benefits is appropriate, however, only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion – that the applicant qualifies for disability benefits." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011). Ultimately, the interplay of Dudley's ulcerative colitis, depression, and PTSD is beyond the Court's power to say, unequivocally, all factual issues involved in his entitlement determination have been resolved and the resulting record supports only that he is disabled. This is particularly so where the ME's testified-to opinion was that

15

Dudley was a "very high functioning – to his benefit – high functioning individual" insofar as his PTSD was concerned. AR 658. The Court expects that on remand, any ME that may be called upon to opine as to Dudley's limitations will be provided a complete, accurate picture of Dudley's daily activities as set forth in *all* the evidence of record (including Dudley's own subjective statements), and the ME will be called upon to opine as to all of Dudley's severe impairments.

## V

For the foregoing reasons, the Plaintiff's Motion for Summary Judgment (Doc. 10) is GRANTED, the Defendant's Motion for Summary Affirmance (Doc. 13) is DENIED, and this matter is REMANDED pursuant to Sentence Four of 42 U.S.C. § 405(g) for the ALJ to correctly consider the factors set forth in SSR 96-7p, obtain additional testimony from a ME as to the interaction between all three of Dudley's severe impairments, and formulate a new RFC finding, if necessary.

The Clerk of Court is directed to enter judgment as follows: IT IS ORDERED AND ADJUDGED that this case is remanded to the Commissioner of Social Security for further proceedings consistent with this Opinion pursuant to 42 U.S.C. § 405(g), Sentence Four.

*It is so ordered.*

Entered on March 18, 2019.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE